(No. 41975.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* RICHARD NUCCIO, Appellant.

*Opinion filed November 26, 1969.*

JULIUS LUCIUS ECHELES, JO'ANNE F. WOLFSON, and MICHAEL M. KACHIGIAN, all of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (ELMER C. KISSANE, THOMAS TULLY, and JAMES CAVANAUGH, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Richard Nuccio, was found guilty of murder at the conclusion of a bench trial in the circuit court of Cook County and sentenced to 14-15 years imprisonment. He appeals directly here contending he was deprived of his constitutional right to confront the witnesses against him; that "the evidence did not justify the verdict"; that the court used a constitutionally impermissible standard in making its decision; and that improper prosecutorial questioning of defendant and his witnesses deprived him of a fair trial.

The testimony is voluminous and conflicting, with few matters undisputed. It is clear, however, that the event in question occurred on the night of June 4, 1968, in an alley near a large parking area opposite Wrigley Field in Chicago.

This parking area was bounded on the north by Patterson Avenue, on the east by Clark Street, on the south by Addison Street, and on the west by an alley running diagonally north and south between Patterson Avenue and Addison Street. Near its mid-point this alley was intersected by an east-west alley, and the intersection of these two alleys was lighted by an overhead light attached to a pole. The Franksville Restaurant was located at the southwest corner of this parking area, and a Tastee-Freez Ice Cream stand was at the northeast end surrounded by parking area. Driveways led into the area from Patterson Avenue and from Clark and Addison Streets.

Ben Citron, owner of the Franksville Restaurant, called the police station on June 4 about 9:30 P.M. to report a "disturbance". Defendant Nuccio, then a Chicago police officer, was on duty with Patrolman Rothmund, and the two officers responded to the call in a marked squad car. Officers Hyatt and Sand arrived at the scene in an unmarked police car. This area had apparently been visited by decedent and a group of his friends with some degree of frequency. There had been prior disturbances involving police calls and arrests, and some members of the group, including decedent, had been ordered by the court to stay away from the property.

After Officers Nuccio and Rothmund parked their car in the parking area, the former went to a group of young people near the Tastee-Freez and the latter went to the Franksville area where he saw and talked to Ben Citron. Citron pointed to one Steve Austill walking towards Clark Street away from the restaurant and said, "There's one", or "there goes one of them". Then Citron pointed to Ronald Nelson, the 19-year-old decedent, who was sitting at a table on the patio outside the restaurant and said, "There's another one that shouldn't be here". Citron testified that he had seen Nelson sitting at the table playing with a knife. While Nelson had had no contact with Citron that evening,

Citron was "scared" when he saw Nelson in possession of the knife and called the police because on a previous occasion Nelson had come into his store, created a disturbance and hit him. Officer Rothmund testified that he saw Nelson playing with a pocket knife while Nelson was sitting at the table and immediately before he jumped up and ran. Trena Ciabay, a 16-year-old high school senior, testified that she was present that evening and had been sitting at one of the tables with Nelson for about three minutes before the police arrived. She did not see anything in his hands nor did she see anything on the table. Leonard Noe, another State witness, also testified that he could see Nelson at the table and saw no knife.

After Citron pointed to Nelson and when Officer Rothmund turned toward him, Nelson got up and ran. Citron went back into his place of business. Officer Rothmund testified that he shouted to the other police officer to "grab that man and watch out, he has a knife" (or something similar), and then ran over to where Steve Austill was sitting on an "ad" bench at the corner of Clark and Addison at the southwest tip of the parking area and began to place Austill under arrest.

Officer Nuccio was searching one of the group, John Ahrens, for weapons when he heard Rothmund call from the area of the restaurant, "Stop him and watch out, he's got a knife". Both Officers Hyatt and Sand, the plain clothesmen who arrived in the second car, testified that they hear Rothmund yell, "Look out, he's got a knife".

John Ahrens testified that he heard a shout, "Stop him". Six other young persons, who were gathered near the Tastee-Freez and were near the defendant and Ahrens, testified that they heard a shout, "Stop him", or "Get him" coming from the area of the Franksville Restaurant. Only two of them were specifically asked whether they also heard "watch out, he's got a knife" and both of those asked responded they had not.

After hearing the shouted command, Officer Nuccio looked in the direction of the Franksville Restaurant and saw Nelson running in a northwesterly direction toward the juncture of the east-west and north-south alleys.

The testimony is again conflicting as to the defendant's subsequent conduct, although all the witnesses agreed that the defendant immediately ceased searching Ahrens and began to run toward Nelson.

Officer Hyatt had alighted from the unmarked police car he arrived in and was in the area of the parking lot between Franksville and the Tastee-Freez, walking toward the latter, when he heard Officer Rothmund yell. He turned and saw Nelson running from Franksville. He started running toward Nelson, first running somewhat southwesterly and then as Nelson ran northwest he followed him in this direction. As he was running toward the "T" in the alleys, he saw the defendant at a point 15-30 feet east of the "T" and running toward the east-west alley. Nelson was already in the east-west alley and running west on the north side. Officer Hyatt testified that as he and the defendant were entering the alley, he saw something that flashed in Nelson's hand and he presumed it to be a knife. As Nelson was running he looked over his right shoulder and twisted his shoulder to the right. At that time Officer Hyatt screamed, "Look out, he is going to throw the knife". The defendant fell to his knees and fired a shot. Nelson fell forward to the ground.

Officer Hyatt testified that he never drew his gun at any time, and the defendant pulled his out as he was dropping to the ground; that at the time defendant fired the knife was in the air. Officer Hyatt also testified he was slightly behind and to the left of defendant, and estimated that the decedent was approximately 20-25 feet ahead of defendant at the time of the shot. An opened knife, identified by this officer as the one Nelson had, was found in the alley.

Defendant testified that he saw Officer Hyatt trying to

apprehend Nelson and defendant started running westerly toward the alley to cut Nelson off at the entrance to the alley; when Nelson reached the entrance to the alley, the defendant hollered at him to stop, but Nelson turned into the east-west alley and headed west. When Nelson was 40 feet into the alley, and the officers were 20 feet behind him, defendant saw Nelson look back at him, raise his right arm with a knife in his hand and heard Officer Hyatt scream, "Watch out, he's going to throw the knife". Defendant testified, "I dove to the ground and fired, it all happened instantly."

The State's witnesses gave a somewhat different description of the events and differed entirely from the police officers as to the presence of a knife. John Ahrens, whom the defendant had been searching when the shout was heard, testified that the defendant had taken only a few steps when he began to draw his gun. Edward Ryan and Jose Rodriguez, other young men who were near the Tastee-Freez and the spot where the defendant was searching Ahrens, gave similar testimony. Linda Young, who was sitting in a car parked southwest of the Tastee-Freez, testified defendant pulled his gun as he was running. Noel Kitchen, also standing in this area, testified that the defendant drew his gun right before he got to the alley.

Ahrens and Leonard Noe, another young man who was sitting at one of the tables outside Franksville, testified the defendant stopped about 15 feet east of the alley light located at the entrance to the east-west alley, aimed and fired a shot at Nelson. Jose Rodriquez estimated this distance at 30 feet; Edward Ryan at about 20 feet. The estimates given by the State's witnesses of the distance between the defendant and Nelson when the shot was fired ranged from 70 to 90 feet. None of the State's witnesses testified to having seen a knife or object in the hand of Nelson as he ran. Although some of the State's witnesses saw Nelson look over his shoulder or at least turn his head as he entered the east-

west alley, none of them saw him turn or look back as he was running west down the alley.

The trial judge accepted the State's version of the distance between defendant and decedent at the time the shot was fired and found that distance to be 70-90 feet. The defendant's claim that the proof does not establish guilt beyond a reasonable doubt is, therefore, not sustainable for the testimony of the State's witnesses, if believed by the trier of fact, is sufficient to justify the verdict. Ill. Rev. Stat. 1967, ch. 38, par. 7—5.

The argument that defendant was deprived of the opportunity to confront the witnesses against him is interwoven with the argument that improper prosecutorial questioning of defendant and his witnesses deprived him of a fair trial. Both arguments are predicated upon a persistent course of cross-examination by which the State repeatedly insinuated, generally without any supporting testimony, that defendant and his witnesses had engaged in a pattern of reprehensible conduct in their relationships to the youths who frequented Franksville. The impact of the State's unsupported insinuations can only be made clear here by a rather lengthy cataloguing of relevant examples, for it is the totality of the impact which compels our conclusion that the defendant's right to a fair trial, with the attendant's right to cross-examine witnesses against him, was denied.

The impropriety of the cross-examination does not rest simply upon unsupported insinuations of misconduct, but also upon the State's failure to present appropriate rebuttal testimony in response to the defense witnesses' specific denials of misconduct. A fair portrayal of the circumstances requires summarization of the testimony of the two witnesses who did testify to prior misconduct of defendant.

Stephen Austill, while testifying as a State's witness, stated he had been at the police station in February, 1968, when decedent was in custody and that defendant had asked

Nelson about his girlfriend, stating that he [defendant] had been making love to her. Defendant allegedly stuck his gun to Nelson's head and asked him if he wanted to play Russian roulettee, and ran his [defendant's] knife down decedent's arm, stating that decedent deserved to die and that defendant was going to get him personally. Austill testified that on an earlier occasion, when he had gone to the station while decedent was in custody, "to try and see what I could do for him," defendant stated to the witness, "I'm going to kill you and your punk friend."

On cross-examination Austill testified that the decedent was his best friend. He admitted that he had been arrested in connection with the crimes of shoplifting, car theft, disorderly conduct and possession of marijuana. He admitted that on one occasion when decedent was in police custody, Austill falsely claimed to have access to information on narcotics sales, which he offered to provide in exchange for decedent's release, and that after the release he failed to provide any information.

Another State's witness, Noel Kitchen, testified that on one occasion at Franksville, defendant had "said he would take his badge off any time that I thought that I could do something about it." The following statement was then read to Kitchen, who reluctantly acknowledged having made it on June 5, 1968:

"Q. Did you ever have any contact with Officer Nuccio in the past?

A. Yes, one time I was sitting in front of Franksville, Officer Nuccio came up and grabbed me for no reason at all, he told he me he was going to beat the crap out of me if I didn't get out of there. At that time I told him that if he didn't have his badge on, I would fight him."

Thereafter another portion of the same statement was read:
"He said, I don't have my badge on and he pulled out his blackjack, at this time Officer Nuccio had his cousin with

him and I got into a fight with the cousin but Nuccio didn't participate. Another time Officer Nuccio searched my car, this was about a month ago." Kitchen testified that the alleged altercation had taken place about a year before Nelson's death, but also stated that he had seen defendant on other occasions since the summer of 1967, both on duty and off duty, pull out a gun and a blackjack while at Franksville, often to disperse a crowd of youths. Kitchen also admitted that some weeks prior to the shooting, the owner of Franksville had told him to leave the premises.

Aside from this testimony by Austill and Kitchen, no State witness supported the insinuations of misconduct which were levelled at defendant and other defense witnesses during the State's cross-examination. We turn now to the State's unsupported insinuations of a general pattern of misconduct on the part of defendant and the two main defense witnesses, Officers Kenneth South and Michael Nuccio (unrelated to defendant).

There were three basic inferences which would naturally arise from the State's insinuations: 1) that the State was prepared to show by rebuttal testimony that defendant and his witnesses often intimidated and chastised the youths who congregated at Franksville, and that the defendant may therefore have been pursuing a general pattern of indiscriminate abuse when he shot Ronald Nelson; 2) that the State would show in rebuttal that the defense witnesses, and defendant in particular, had in fact been promiscuously involved with the girls who congregated at Franksville, particularly with Ronald Nelson's girlfriend, and that therefore defendant may have had a specific motive for killing Nelson; and 3) that the State would show in rebuttal that the defendant and his witnesses had been guilty of perjury in the prosecution of a Franksville youth and had intimidated prospective State's witnesses in the instant case.

The following illustrations are taken from the State's cross-examination of the designated defense witnesses:

MICHAEL NUCCIO—

"Q. Isn't it a fact you challenged Mr. Keating to a fight?

A. No, I did not.

Q. Didn't you challenge him to come around in the back and 'Let's have it out'?

A. No, I did not."

KENNETH SOUTH—

"Q. Did you ever take Ronald Nelson, alone with Officer Nuccio, down to Lake Michigan and take his shoes off?

A. No.

Q. Did you ever leave Ronald Nelson down at Lake Michigan without any shoes and have him walk home?

A. No, I didn't."

RICHARD NUCCIO—

"Q. Do you recall the day after St. Patrick's Day, 1968, were you working?

A. I don't remember, sir.

Q. Do you remember firing at a person by the name of Steven Weinstein and Mr. Darryl on Clyborne Avenue?

A. No, sir.

Q. You never took out your gun on the evening?

A. I didn't say that, sir.

Q. Did you take out your gun that evening?

A. Yes, sir.

Q. Did you fire it?

A. No, sir.

Q. Do you recall ever threatening Mr. Nelson's life in the presence of a Norman Suderski?

A. No, sir.

Q. Do you recall ever telling John Ahrens, in the presence of Mr. Nelson, that you were going to blow Ronald Nelson's brains out and you were going to blow John Ahrens' brains out?

A. Absolutely not, sir.

Q. Do you recall or do you know a person by the name of Fillipp?

A. What is the name again, sir?

Q. Fillipp, do you know somebody by the name of Fillipp?

A. I believe that is somebody's first name, but I wish you would give me the last name.

Q. How about Stephan Fillipp, F-I-L-L-I-P-P, he lives at 3843 North Hoyne, do you know him?

A. I don't recall, sir.

Q. Haven't you arrested him in the past?

Mr. Echeles: What is the name?

Mr. Tully: Stephan Fillipp, F-I-L-L-I-P-P.

A. I don't recall if I had or not.

Q. Did you ever recall talking to Mr. Nelson and Mr. Fillipp in which you told both of these men that they usually end up with your head being blown off?

A. No, sir. I don't think I even know a Mr. Fillipp.

Q. Okay. Do you recall ever telling Mr. Nelson that if he reported any of this to the I.I.D.—

Mr. Echeles: Object, your Honor, to the preface of his questions: do you recall.

The Court: Yes, rephrase your question.

Mr. Tully: All right.

Did you ever tell Mr. Nelson that if you ever threatened him—strike that—if Mr. Nelson ever told anybody from the I.I.D. about threatening to kill him, that he would kill. Mr. Nelson?

Mr. Echeles: Object, your Honor. How would he know what Nelson would say to somebody else?

The Court: Well, this is directed not at what Mr. Nelson would say to somebody else, but what he said to Nelson.

Mr. Echeles: It is my understanding that is not

the question, your Honor. If it is, I'll withdraw the objection.

The Court: Rephrase it.

Mr. Echeles: Excuse me. May the court reporter read the question?

The Court: Yes.

(Record read by reporter.)

Mr. Tully: I'll rephrase the question.

Did you ever tell Mr. Nelson that you would kill him if he reported any threats to the I.I.D.?

A. No, sir.

\* \* \*

Mr. Tully: Now, this evening of March 18th, do you recall talking to a Mr. Weinstein?

A. I never talked to a Mr. Weinstein, sir.

Q. Do you recall slapping around Mr. Darryl that evening after shooting at him?

Mr. Echeles: Object to the form of the question about recalling something that no direct question was asked to predicate—

The Court: Rephrase the question, please.

Mr. Tully: Do you recall punching Mr. Darryl around after firing at him?

Mr. Echeles: Object, your Honor, to the form of the question. Just a moment.

The Court: Rephrase the question, please, Mr. State's Attorney.

Mr. Tully: Yes, sir, your Honor."

The State then dropped the question without rephrasing or re-presenting it.

The insinuations that a prior pattern of promiscuous involvement may have predicated the shooting of Ronald Nelson were framed in both general and specific references to the girls who congregated at Franksville:

MICHAEL NUCCIO—

"Q. Don't you even make caustic or vulgar statements to young ladies that hang around that Franksville Restaurant?

Mr. Echeles: I object to the form of the question.

The Court: The form is improper.

Mr. Tully: Haven't you intimated to young ladies that come around there that they are dirty whores?

Mr. Echeles: Excuse me, your Honor. He should give time and place and the lady of whom he speaks.

The Court: Sustained.

Mr. Tully: Haven't you made caustic remarks to young ladies up there, all those evenings that you were hanging around there off duty?

A. Will you please define "caustic" for me, please?

Q. Did you ever call any of the young ladies up there whores?

A. No, I did not.

Q. You're a married man, is that correct, sir?

A. That is correct.

Q. Do you have a family?

A. Yes, I do.

Q. You still hang around Franksville, is that right?

A. That is right."

RICHARD NUCCIO—

"Q. In fact, didn't you generally go up there [Franksville] almost every night of the week?

A. No, sir.

Q. You are a married man?

A. Yes, sir.

Q. You have a family?

A. Yes, sir.

Q. You didn't hang around there with Mike Nuccio?

A. No, sir.

Q. You knew Mike Nuccio hung around there?

A. No, sir.

Q. Well, on those occasions that you would go up there did you ever see Mike Nuccio?

A. Occasionally.

Q. Did you talk to him?

A. Yes, sir.

Q. Would Mike Nuccio be in uniform or would he be in plain clothes?

A. I think he would be in plain clothes, sir.

Q. Do you know a girl by the name of Sylvia Londis?

A. Yes, sir.

Q. She was a girlfriend of Ronald Nelson, is that correct?

A. Yes, sir.

Q. Did you ever ask Miss Londis out for a date?

A. No, sir.

Q. Did you ask any of the ladies up in that Franksville area for a date?

A. No, sir.

Q. Did you ever call those girls up there dirty whores?

A. Never.

Q. You never called them dirty whores?

A. Never, sir.

Q. Did you ever use any profanity or vulgarity to them?

A. No, sir."

Further insinuations prompted the inference that testimony would be presented in rebuttal to establish perjury in a separate criminal prosecution, and intimidation of opposing witnesses in the prosecution of Officer Nuccio.

Michael Nuccio testified on direct examination to an incident on June 11, 1967 at Franksville:

"I was on the premises over there having lunch or dinner that night, and Mr. Citron, the owner of Franksville, summoned me to talk to some of the youths in

back who were throwing stones and creating a disturbance, and I proceeded to go back there and talk to some of the youths.

I asked them if they would please leave. They began to leave; and, as one of the boys,—It was a James Keating, I believe it was,—as he was walking across the street, he turned and began to use profanity at me. I went across the street and I took him back to Franksville. I was proceeding to bring him into Franksville to call for a wagon, and told him he was under arrest and at that time he turned and lunged at me. Officer Richard Nuccio was at my side at that time. We tried to subdue him and, at the same time, approximately ten other youths came at us.

Mr. Echeles: Do you know the names of these other youths who came at you?

A. There was a Markko,—I don't believe I know his first name—a Futch,—

Q. A fudge?

A. Futch, F-u-t-c-h, there was a Steve Austill, Ron Nelson, John Ahrens, I believe it is.

Q. Will you look around the courtroom and see if you see John Ahrens in this courtroom?

A. Yes. I believe he's sitting in the second or third pew back on the left. (Indicating.)

\* \* \*

Q. Did you see Ahrens with anything in his hand?

A. Yes, I did.

Q. What did he have in his hand?

A. A board."

In cross-examining Officer Michael Nuccio in relationship to this incident, the State continued the tactic of making unsubstantiated insinuations:

"Q. The only one that was brought to a courtroom was James Keating, is that right?

A. No. There were other youths brought to court.

Q. Do you recall throwing Phil Futch into that squad car or squadrol that evening just after he drove up?

A. No, I don't recall throwing him into the squad car.

Q. Isn't it a fact that he wasn't even present at the time of this alleged incident between you and Mr. Keating?

A. He was present.

Q. He didn't do anything, though, did he?

A. Yes. He was part of the youths that were in-volved.

Q. Part of what youths that were involved?

A. That were involved in the disturbance and a gang of youths, as I stated in my case report, that came at us.

Q. Ron Nelson wasn't even present when this thing happened?

A. Yes, he was.

Q. Why did the captain release him?

Mr. Echeles: Object, your Honor.

The Court: Sustained.

Mr. Tully: Did you ever tell Karen Green that you made a mistake, that John Ahrens was never involved in this situation?

A. No, I didn't."

Continuing to cross-examine Michael Nuccio, the State pursued the unsupported insinuation that State's witnesses had been threatened in connection with this case:

"Q. Since the shooting happened, have you threatened people, to break their arms, as they testified in this case?

Mr. Echeles: I object, your Honor.

The Court: Sustained.

Mr. Tully: Have you ever told Steve Austill that you are going to break his arms, if he testifies in this case?

A. No.

Q. Were you ever with Kenny South, when he threatened Steven Austill he would break his arms if he testified in this case?

A. No.

Q. Did you ever pull out your gun on your off duty hours, and point it at any of these people.

A. No. I have never had an occasion to."

Officer Kenneth South stated during direct examination that he had never threatened Austill in any manner. Thereupon the State began cross-examination, pursuing the matter of threats and also insinuating that Officer South had told the other State's Attorney on the case that he didn't want to testify in defendant's behalf:

"Q. Officer South, you would tell us, wouldn't you, sir?

A. I beg pardon?

Q. You would tell us if you had threatened to break his — —

Mr. Echeles: Object to the form of the question.

The Court: Sustained.

Q. Do you recall talking to Mr. Walsh [assistant State's Attorney] Friday evening of last week?

A. I had occasion to speak to him at Franksville.

Q. Did you tell Mr. Walsh you didn't want to get involved in this case?

A. No, I didn't say that to Mr. Walsh."

The cross-examination of defendant was again improper, particularly in relationship to the incident, related by Officer Michael Nuccio, involving a group of youths attacking Michael Nuccio and the defendant:

"Mr. Tully: Have you ever pulled out your gun at the Franksville Restaurant on any occasion other than June 4, 1968?

A. Yes, sir.

Q. When?

A. After I was struck by the board and the offender was going to strike me again.

Q. Who was the one with the board?

A. John Ahrens.

Q. Didn't you testify against a Mr. Keating, that he had the board?

A. No, sir.

Q. Isn't it a fact that the warrant which was issued was issued in error as to the wrong person?

A. No, sir.

Q. Do you know where Mr. Keating is at right now?

A. I believe he is in the Army, sir.

Q. Isn't it a fact that you, in fact, arrested Mr. Futch that evening, who wasn't even present during that altercation?

Mr. Echeles: Objection, your Honor, unless he goes on the stand to testify—

The Court: Sustained.

Mr. Echeles: Object to the form of the question, your Honor.

The Court: Sustained.

Mr. Echeles: Will Mr. Tully testify? I have Mr. Walsh's assurance that Mr. Tully will testify. He withdraws the assurance.

The Court: Proceed.

A. Would you repeat that? (Pending question read by reporter.)

A. I arrested him but he was present in the altercation. You were wrong with your question.

Mr. Tully: I don't know if I was wrong with the question. Your answer might be wrong.

Mr. Echeles: Object to arguing with the witness.

The Court: Proceed."

On August 26, 1968, the defense rested its case at 1:00 P.M. The court recessed until 2:00 P.M. at which

time the State put in the testimony of one witness in rebuttal. Following this witness's testimony, the State moved for a continuance on the grounds that additional rebuttal witnesses were not present because they had difficulty attending due to the bus and taxi strikes. Counsel for the defense pointed out that a number of the people the State asked questions about—Weinstein, Futch, Austill, Ahrens—were in the courtroom and would be available as rebuttal witnesses. The State, however, did not call any of them, but pressed for the continuance which was granted and the trial recessed until the following morning. At that time the State indicated it did not plan to call any of the witnesses who were in court and available to be put on the stand the previous day.

At the conclusion of all the evidence the defense moved for a mistrial briefly reciting the State's questions, some of which were herein quoted, noting that there was no rebuttal of the denial of the accusations contained within the questions, and alleging that the sole purpose in asking the questions was to prejudice the court. The trial court responded: "The motion for a mistrial will be denied."

It apparently is the State's position that the above questions were legally improper when asked and that the defendant has waived his objection to their prejudicial effect by failing to object at trial. In the words of the defendant he "is in the unusual position of justifying [this conduct of the prosecutor which] the state seeks not to justify". Defendant urges that the prosecutor's questions relating to the alleged prior threats by him against the decedent were proper at the time they were asked provided the State was ready to prove the threats in the event the witnesses denied the accusations implicit in the State's questions. He cites *People* v. *Slaughter*, 29 Ill.2d 384, 390, where this court stated: "Prior threats of an accused to do violence to the person eventually slain have consistently been held to be admissible in evidence as showing malice and criminal intent * * *". (*People* v.

*Poland,* 22 Ill.2d 175; *People* v. *Lion,* 10 Ill.2d 208.) Defendant urges that he is entitled to assume the prosecution would not ask such patently prejudicial questions unless proof of the threats was available, and, therefore, he is under no obligation to object thereto, particularly where he moves for a mistrial as soon as the inability or unwilling-ness of the State to produce such proof is manifested. With this we agree.

We do not intend this opinion to indicate that no objection should have been made by defendant to any of the testimony herein quoted. The admissibility of portions of the testimony unrelated to threats is at least doubtful and might well have been excluded. We have included portions of it here, however, because it seems to demonstrate an intent on the part of the prosecution to prejudice defendant in the eyes of the court.

The vexing question is whether this pattern of prejudicial and unsupported insinuations which would, without question, necessitate a new trial had this case been heard by a jury, (*People* v. *Black,* 317 Ill. 603, 616—17; see *People* v. *Sanders,* 357 Ill. 610, 622) requires the same result in a bench trial. The State calls attention to numerous cases such as *People* v. *Grodkiewicz,* 16 Ill.2d 192, and *People* v. *Earl,* 34 Ill.2d 11, wherein this court has indicated that it will be presumed that a judge considers only competent and proper evidence in reaching his decision.

We have examined these and other cases cited by the People as support for their argument that the trial judge in a nonjury trial must be presumed to have disre-garded incompetent evidence. *People* v. *Popescue,* 345 Ill. 142, 155—56, does contain a similar statement, but the court there held the alleged incompetent evidence to be competent and properly admissible in the hearing on ag-gravation and mitigation. *People* v. *Grabowski,* 12 Ill.2d 462, also cited by the People, relies on *Popescue* and is identical insofar as its lack of application here is concerned, for in

*Grabowski* the court also held evidence of other crimes properly admitted in an aggravation and mitigation hearing. In *People v. Delno,* 35 Ill.2d 159, 162, the court's statement of the presumption that the judge considers only competent evidence was qualified by the phrase "Where guilt is otherwise manifestly shown", and the improper evidence in that case consisted only of a statement that defendant "did not want to make a statement" about the case. In *People v. Pelegri,* 39 Ill.2d 568, 574-75, the defendant complained of numerous instances of improper closing argument by the State, but the trial judge sustained defense objections to portions of the argument which were in fact improper and also remarked from the bench that he was aware of the nature of the argument. Likewise, in *People v. Wallenberg,* 24 Ill.2d 350, 353, it appeared from the record that the court was not influenced by the improper evidence because he ordered the improper question to be stricken and stated that there was nothing therein of probative value with respect to the defendant. Similarly in *People v. Earl,* 34 Ill.2d 11, 13, the record indicated that the trial court in a joint trial was aware that the statements of the co-defendant implicating the defendant Earl were not competent evidence against Earl and the court ruled that the statements were inadmissible against him. There is no indication in this record that the court recognized the effect of the prosecution's failure to establish the prejudicial misconduct which it insinuated.

The remarks of the State's attorney in *People v. Grodkiewicz,* 16 Ill.2d 192, 199, if improper, were brief and of little significance compared to the substantial amount of improper insinuation appearing in this case. Likewise, in *People v. Alexander,* 21 Ill.2d 347, 353, there was no series of unsupported suggestions of misconduct such as we have before us here.

While we could continue to distinguish the many other cases which contain statements of the presumption that

judges consider only competent evidence, no useful purpose would be served by doing so. The rule as generally applied is a sound one. But there are, it seems to us, limits to the immunity to improper and prejudicial insinuations which judges are presumed to possess. Stripped of the haze created by the innuendoes, the shooting here was either done by an officer who was the target of a knife being thrown at him by decedent from a distance of 20-30 feet as described by defendant and his witnesses, or it was the wanton killing testified to by the State's witnesses. Where, as here, the guilt of the accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact to his testimony and that of the witnesses who testify on his behalf, and there appear in the record substantial numbers of unsupported insinuations which, if considered, could have seriously impeached the credibility of the defendant and his witnesses, and there is no indication of the court's awareness of this impropriety even though it is brought to his attention, it is our opinion that justice and fundamental fairness demand that the defendant be afforded a new trial free from such prejudicial misconduct.

The judgment of the Cook County circuit court is accordingly reversed and the cause remanded for a new trial.

*Reversed and remanded.*