THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL WILLIAMS, Defendant-Appellant.

First District (5th Division) No. 1—89—1850

Opinion filed August 27, 1993.—Rehearing denied November 24, 1993.

Rita A. Fry, Public Defender, of Chicago (Mary C. Arundel, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Carl Williams, was charged with attempted murder, aggravated battery, aggravated battery of a child, and cruelty to children. Following a jury trial, defendant was convicted of attempted murder and was sentenced to a 60-year imprisonment term at the Illinois Department of Corrections. Defendant appeals.

The issues presented for review are: (1) whether the State failed to provide race-neutral reasons for excluding two African-Americans from the venire; (2) whether the State's cross-examination of defend-

ant regarding information he reportedly gave to a probation officer about employment and also regarding what he allegedly told a friend about the child's injuries constituted error; (3) whether the trial court erred by limiting defendant's cross-examination of the victim's mother about Department of Children and Family Services (DCFS) neglect charges against her; (4) whether the trial court erred in allowing evidence of prior injuries to the victim's sister; (5) whether the trial court abused its discretion by refusing defendant's request for a continuance; (6) whether certain alleged discovery violations denied defendant a fair trial; (7) whether it was error for a State witness to testify about observing defendant lift a man and throw him down; (8) whether the State's rebuttal closing argument constituted error; (9) whether the trial court erred in allowing a physician to testify that the injuries sustained by the child were consistent with child abuse; (10) whether the trial court properly denied defendant's motion to suppress statement; (11) whether the trial court erred by imposing a 60-year sentence; (12) whether the cumulative effect of errors deprived defendant of a fair trial; and (13) whether defendant was proven guilty of attempted murder beyond a reasonable doubt.

We reverse and remand for a new trial.

BACKGROUND

On the morning of July 24, 1987, paramedics transported two-year-old Earnest Henry (Ernie) to the emergency room of Evanston's St. Francis Hospital. There, Dr. Aguilara, the emergency care doctor, noted that Ernie was comatose and suffering from a serious head injury. Dr. Aguilara testified that he suspected child abuse and did not expect Ernie to live.

Later that day, Ernie was taken to Children's Memorial Hospital, where he was examined by Dr. McClone, chief of the pediatric surgery department. He found Ernie's condition to be extremely critical. Ernie's brain was pouring into his neck and spinal column. Dr. McClone opined to police officers that Ernie's condition was more than child abuse because he did not expect Ernie to survive.

Ernie was comatose for six weeks and remained at Children's Memorial Hospital for three months during which he endured numerous operations. Upon release from this hospital, Ernie was admitted to the Rehabilitation Institute of Chicago, where he stayed for eight months. When he was released, Ernie was paralyzed on his left side. The doctor from the Rehabilitation Institute testified that Ernie's injuries were consistent with someone of superior strength taking Ernie's head and slamming it into the floor with great force.

Marie Henry (Marie), Ernie's mother, testified that she awoke at 7:45 a.m. on July 24, 1987. Defendant, her live-in boyfriend, and Ernie were already up. She testified that Ernie appeared to be in a daze. She tried to talk to him but he did not understand. She heard three pounding noises while she was in the shower.

Dee Humes (Humes), who lives below Marie, testified that she awoke around 6:45 a.m. on July 24, 1987. She heard Marie's shower around 7:45 a.m. and then heard thumping coming from Marie's bedroom. Twenty minutes later, Humes went to Marie's apartment to investigate. As the door was ajar, she could see Ernie lying facedown on the floor with his eyes going back in his head. He made no movement or noises. She saw defendant attempt to wake Ernie by slapping him on his face. She told defendant that Ernie was in a coma and that he should call an ambulance. Defendant did not respond and Humes left. She did not see Marie.

When Marie finished her shower, she saw defendant carrying Ernie, whose body was shaking and whose eyes had rolled into the back of his head. Marie called an ambulance, paramedics arrived, and Marie accompanied Ernie to the hospital. Defendant went to the hospital later. There, a police officer read defendant and Marie their rights. Both said they understood their rights and agreed to speak to the officer. Marie also talked with detectives and Assistant State's Attorney Mondello (Mondello).

Chicago police officer Warren Seyferlich (Seyferlich) went to St. Francis Hospital around 11:30 a.m. on July 24, 1987. He spoke with hospital staff and then contacted his supervisor. Seyferlich spoke with Marie and defendant in the family waiting room. Both said they did not know what had happened to Ernie. Sergeant Jones (Jones) arrived and read defendant his rights. Defendant said that he understood his rights and agreed to talk with Jones.

Detectives Ryan (Ryan) and Fitzgibbons (Fitzgibbons) arrived at the hospital and spoke with Jones and Dr. Aguilara. Ryan had a conversation with defendant around noon, and defendant said he had been living with Marie since March of 1987. Defendant told him that when he awoke that morning, he saw Ernie lying on the floor with his eyes rolled up into his head. He picked up the child, and when he saw that Ernie was not breathing, he gave him mouth-to-mouth resuscitation. He also rubbed Ernie with cold water and told Marie to call 911. Defendant said he had not struck or injured the child. Defendant said he had not seen anyone else strike the child. When Ryan told defendant about Ernie's injuries, defendant said he had hit the child on the

buttocks a few times the previous week. Ryan left to speak with Fitzgibbons.

Fitzgibbons had spoken with Marie and told Ryan what she said. The two then told defendant what Marie had said. Defendant then told them that on July 23, 1987, he, Marie, and the two kids had been watching television. When Ernie disturbed the television, defendant became angry, placed his hand over the child's face, and shoved him down causing his head to strike the floor. Defendant said that he also struck Ernie with a belt and his fist, and that he disciplined the child in a like manner almost every day since defendant had moved in with Marie.

Defendant was eventually transported to Area 6, where Ryan read him his rights and talked with him around 6 p.m. After each right was read defendant said he understood. Defendant reiterated much of what he had said at the hospital with some additions: because Ernie had bothered the television and was making a mess of his spaghetti, defendant hit him in the head with a remote control. He then pushed Ernie to the floor by placing his hands over Ernie's face, causing the boy to fly backwards and strike his head on the floor. After the kids had gone to bed, defendant checked them around 10:30 p.m. and found that Ernie was not in the position in which he had been told to sleep. Defendant struck Ernie in the chest two or three times and ordered him into the washroom.

Defendant followed Ernie into the washroom, and when he saw that he had left the toilet seat down, defendant picked him up by his clothes and threw him to the floor three times, causing him to strike his head on the floor and on a cupboard. Defendant said Marie was present.

Defendant woke up on the morning of July 24, 1987, to find Ernie acting strangely, so he hit him on the buttocks and later rubbed cold water on him. Defendant said he had often disciplined Ernie in a like manner by using his hands, fists, and belts. Ryan contacted Assistant State's Attorney Mondello.

Mondello reviewed the police reports and spoke with Ryan and Fitzgibbons. After speaking with Marie, she spoke to defendant. She advised him of his rights and defendant stated that he understood each of those rights. Mondello advised defendant that she was an assistant State's Attorney, that she was working with the police, and that she was not his lawyer. Defendant said that he understood. Mondello spoke with defendant for a while, left the room, and returned. She told defendant she was going to write down what he said, and

defendant agreed. Mondello left the room, wrote the statement, and returned.

Defendant read aloud the typewritten portion of the statement which contained the *Miranda* rights. Mondello then read the statement aloud and Ryan testified that defendant moved his eyes as if he were reading. Defendant made corrections and initialled each. All three signed their names to each page. Defendant's statement was published to the jury.

Defendant testified that he suffers from hypertension and cataracts. He said he was blind from birth until age four or five when corrective surgery gave him partial sight. He has always been under doctor's care for his eyes and had further surgery between the ages of 15 and 17. Defendant received eye care while in Cook County jail and had been scheduled for further surgery.

Defendant further testified that on July 23, 1987, Skip, Ernie and his sister's biological father, picked the children up for a visit with him. They did not have any bruises when they left. When Skip returned the children later that night, they had a few minor cuts. Defendant said that the kids appeared to be afraid of something.

Defendant denied hitting Ernie with a remote control on July 23, 1987, but he admitted that he may have spanked him because he and his sister were hitting each other with their toys.

Defendant further testified that around 6 a.m., July 24, 1987, Ernie woke up and wanted some water. Defendant got Ernie the water and sent him back to bed. He did not strike Ernie. Later, Ernie was having a seizure so defendant patted him down with cold water and tried mouth-to-mouth resuscitation. He also tapped Ernie's face in an effort to revive him. Defendant said he told Marie to call 911 and that Humes was present. Defendant denied pounding Ernie's head into the floor on July 24, 1987, striking the child in the face, and slapping him.

Defendant testified that he saw Jones at the hospital and was transported to Area 6. There, Jones read him his rights but no one told him that he was under arrest. He stated that he asked Ryan if he could call his lawyer but Ryan told him that he did not need a lawyer because he was not under arrest. Defendant was permitted to call his brother the next day and told him to contact his attorney, who came to see defendant a week later.

Defendant also testified that Ryan told him that if he cooperated with the "lady reporter" he was about to bring into the room, then defendant would be allowed to go to the hospital. The "lady reporter" was the assistant State's Attorney. He made no admissions to her but admitted signing the papers even though he was not able to read

them because he did not have his glasses. Defendant further testified that he could not see anything on a piece of paper as far as lines are concerned, and he can sign his name only when the place is pointed out to him. The assistant State's Attorney pointed out to defendant where he was to sign. Defendant said that she made corrections and that the statement which she read in court was not the one that she read to him that night at Area 6.

On cross-examination, defendant stated that, to read, he sometimes had to use a magnifying glass or get close to the paper. He said that he did not have a magnifying glass while at the county jail so his cell mate read Marie's letters to him and helped him write letters to her.

Defendant admitted telling Mondello that he could read and write. He admitted that his signatures and initials appeared on the statement.

Defendant also admitted that he filed a *pro se* motion to reduce bond while he was in the county jail, but that it was prepared by a friend. In the motion, defendant did not mention that he worked as a security guard because he thought that it was unnecessary. He did state that he worked at the Victory Center, a church-operated store.

Defendant further testified that there was no doubt in his mind that Skip picked up the kids on the morning of July 23, 1987. He saw Skip when he brought the kids home and Ernie and his sister had bruises and scratches on them.

Officer Dianna Earnest of the Cook County Department of Corrections stated that she is the supervisor of the Old Records Division. She stated that her records reflected that Casley Wilson, also known as Skip or "Irscon [*sic*]" Wilson, was continuously incarcerated at Cook County jail from July 12, 1987, until his release on December 19, 1987.

The jury found defendant guilty of attempted murder. The trial court sentenced him to 60 years' imprisonment. This appeal follows.

OPINION

I

Defendant contends that the State failed to provide race-neutral reasons for excluding two African-Americans from the venire. We disagree.

To prevail on a claim of unconstitutional discrimination in the exercise of peremptory challenges, a defendant must establish a *prima facie* showing of purposeful discrimination. (*Batson v. Kentucky*

(1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) A *prima facie* case of purposeful discrimination is established when the defendant demonstrates that the prosecutor exercised peremptory challenges to remove venirepersons in a discriminatory manner and that relevant circumstances create an inference of discrimination in the exclusion of those venirepersons based on race. *People v. Edwards* (1991), 144 Ill. 2d 108, 152-53, 579 N.E.2d 336.

A trial court's determination is a finding of fact and will not be overturned on review unless it is found to be clearly erroneous. *People v. Andrews* (1993), 155 Ill. 2d 286, 293-94.

The exclusion of even one minority venireperson on account of race is unconstitutional and requires reversal of the conviction below. *Andrews*, 155 Ill. 2d at 294; *People v. Harris* (1989), 129 Ill. 2d 123, 175, 544 N.E.2d 347.

The selection of an all white jury in Cook County is a circumstance which a trial court can take notice of even if defense counsel fails to raise such an issue.

Here, the trial court, *sua sponte*, called a *Batson* hearing and asked why the two African-Americans (Stanley Prewitt and Thomas Landor) had been excluded.

A prosecutor's explanation must demonstrate that the excluded veniremembers exhibited specific bias related to the particular cause to be tried. *Andrews*, 155 Ill. 2d at 294.

Stanley Prewitt (Prewitt) lived on the south side of Chicago. He previously lived on the west side. He was a single parent with a child in grammar school. He had recently been discharged from Arby's where he had been employed for two years. Before Arby's, he did maintenance work.

The State said that it excluded Prewitt because he had just been fired from his job at Arby's, and that he was a single parent. The prosecutor further stated that Prewitt was excused for the aforementioned reasons "as this being a child abuse case." The State contends that Prewitt had no visible means of support, had recently moved, and gave no indication of ever having been married.

■ Employment status has been recognized as a valid race-neutral explanation in the jury selection process. (*People v. Mack* (1989), 128 Ill. 2d 231, 241-42, 568 N.E.2d 1107.) However, the unemployment explanation must be viewed within the larger context of the entire selection process and whether or not there appears to be a pattern of racially motivated strikes. *People v. Sims* (1993), 249 Ill. App. 3d 246, 249-50.

Defense counsel compared Prewitt to a divorced white juror named Ronald Farrar (Farrar). Farrar had two children. He had lived in the northwest suburbs for 20 years and had been an electrician for most of his employed life. He had been working at his job for five years and had been in the trade for 24 years. One of his children worked and the other could not because of an ailment.

Where the State fails to exclude white veniremembers having the same characteristic as a black venireperson who was excused on the basis of that characteristic, an inference of purposeful racial discrimination is raised. (*Andrews*, 155 Ill. 2d at 295; *Mack*, 128 Ill. 2d at 239.) However, a characteristic deemed unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may be, in a second prospective juror, outweighed by other favorable characteristics. *Andrews*, 155 Ill. 2d at 295; *Mack*, 128 Ill. 2d at 239.

We find no error in the trial court's determination.

Thomas Landor (Landor), the other African-American who was excluded, lived on the west side of Chicago for 16 years at the current address and had been a cutter for Mars M&M's for three months, before which he was a truck driver. He was married and his wife had been working at a record company for two years. He had two children, one in grammar school and the other in high school.

During the *Batson* hearing, the State indicated that Landor was excused because he lived on the west side of Chicago in an area that the State did not think was conducive to his hearing the case. The State was not pleased with Landor's demeanor while he was answering the judge's questions, and he began to "nod off" during the questioning of other prospective jurors.

Defense counsel compares Landor to Renee Arza, a white juror. Arza lived in the northwest suburbs, was a veterinary biologist, and had been at his present job for six months. He acquired a degree in Santo Domingo, resided in the United States for 23 years, and was single.

Absent clear error, a trial court's determination will not be overturned. We find no clear error.

II

Defendant contends the State's cross-examination of him regarding information he reportedly gave to a probation officer about employment and also regarding what he allegedly told a friend about the child's injuries constituted error. We agree.

Where a witness, when asked as to the making of statements inconsistent or at variance with his testimony, neither directly admits

nor denies the making of such statements, but states that he does not know or recollect, or gives any other answer not amounting to an admission, it is competent to prove the affirmative by way of impeachment. *People v. Preston* (1930), 341 Ill. 407, 419, 173 N.E. 383; *People v. Bush* (1963), 29 Ill. 2d 364, 372, 194 N.E.2d 356.

Therefore, it is improper for the prosecution to make unsupported insinuations of misconduct on cross-examination without producing supporting evidence in response to denials of misconduct. *People v. Nuccio* (1969), 43 Ill. 2d 375, 381, 253 N.E.2d 353; *People v. Beringer* (1987), 151 Ill. App. 3d 558, 561, 503 N.E.2d 778; *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 405, 428 N.E.2d 503.

Where the guilt of the accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact to his testimony, and there are substantial numbers of unperfected insinuations which, if considered, could seriously impeach the credibility of the defendant and his witnesses, justice dictates that defendant be given a new trial. (*Nuccio*, 43 Ill. 2d at 396.) The question is one of degree.

During cross-examination, the State asked defendant questions regarding his previous employment:

"Q. MR. VICTORSON [Assistant State's Attorney]: Do you remember telling her [probation officer Linda Hynek] that you worked for Star Detective Agency at 813 East 75th Street for the past seven years as a security guard earning $8.50 per hour?

A. DEFENDANT: I might have.

\* \* \*

Q. Do you remember her telling you that Star Detective Agency had no records of you ever working there?

A. She might have, I don't remember.

Q. Were you able to explain to her how it was that you told her you had worked somewhere for seven-and-a-half years, that place had never heard of you?

MR. MILLER [Defense Counsel]: Object to the form of the questions relating double hearsay type testimony.

THE COURT: Objection overruled.

Q. MR. VICTORSON [Assistant State's Attorney]: Were you able to explain to her how come those people never heard of you when you said you've been there so long?

A. DEFENDANT: I might have, but I do believe she had talked to the father-in-law previously.

Q. I'm talking about the Star Detective Agency?

MR. MILLER [Defense Counsel]: Once again, double hearsay, form of the question, they are going from Star Agency to Linda Hynek to the defendant, form of the question.

THE COURT: Cross-examination, he made certain statements here that he worked for Star Agency some time ago. This is certainly contrary, contradictory to that, proceed.

Q. MR. VICTORSON [Assistant State's Attorney]: Did you tell Linda Hynek that you were working at a place called the Victory Center?

A. DEFENDANT: Yes.

Q. What was the nature of your duties with Victory Centers?

A. I was working in, workclothes store, carpet and furniture store.

Q. What was your job there?

A. I was working all over.

Q. What was the nature of your duties?

A. Whichever duty it was, working in the workclothes section, working in the carpet section or working in the furniture section.

Q. Selling?

A. Selling, carrying, moving, sweeping.

Q. You told Linda Hynek when you were interviewed for this probation report, you were a floor manager there, right?

A. Yes, I might have told her that.

Q. That wasn't true wasn't [sic] it?

A. I didn't say that as [sic] wasn't true.

Q. Now, yesterday, when you were talking about your work for the Victory Centers, you said that that was charitable work, right?

A. Yes.

Q. You were doing that out of the goodness of your heart?

A. Yes, and return I was given a donation.

Q. You told Linda Hynek you were working there, you were getting paid a salary on commission?

A. I was working there on a commission, before I started working that charity work, I told you I had to leave it alone for full-time job.

Q. For a full-time job?

A. Yes.

Q. Where was that full-time job at?

A. Which one?

Q. You left Victory Centers for?

A. Jewel's.

Q. Jewel Food Store?

A. Yes.

Q. You never told Linda Hynek about that job, did you?

A. Yes.

Q. Your security guard work, whether it was for the Star Detective Agency who never heard of you or a private—

MR. MILLER [Defense Counsel]: Objection.

THE COURT: Sustained."

■ The court erred in overruling the objection to the State's questions asking defendant to explain why people never heard of him at the Star Detective Agency. Further, the State did not perfect the questioning. The court did sustain an objection after prolonged examination. Yet, this prolonged cross-examination with unperfected, improper questions and improper rulings diminished defendant's credibility.

Instead of overruling the objection to this line of questioning, the court compounded the error by stating:

"[H]e made certain statements here that he worked for Star Detective Agency some time ago. This is certainly contrary, contradictory to that, proceed."

Additionally, in response to other State questioning, defendant answered that he was a floor manager while working in a store where he was engaged in "Selling, carrying, moving, sweeping." The State then retorted, "That wasn't true wasn't [sic] it?" Defendant answered that he did not say that it was not true. The State's comments constituted error because no perfection was had regarding these questions. Also, no perfection was had when the State asked defendant about his employment at the Jewel Food Store: "You never told Linda Hynek [probation officer] about that job, did you?" Defendant answered "yes" to this question.

The State also conducted the following cross-examination:

"Q. MR. VICTORSON: [Assistant State's Attorney]: Did you ever tell him [Tracy Miller—defendant's friend] that it was Irscon [sic] Wilson who had inflicted these injuries on July the 23rd of '87 that you were accused of?

A. DEFENDANT: I don't recall.

Q. As a matter of fact, what you told Tracy Miller about it was that you don't remember how these injuries occurred, isn't that what you told Tracy Miller?

A. I don't recall."

The State cites *People v. Moore* (1973), 54 Ill. 2d 33, 37, for the proposition that only if a defendant denies making a statement is it incumbent upon the cross-examiner to offer evidence that such statement was made. The State asserts that defendant's replying "I don't remember" and "I might have" was not a denial, and thus, perfection of impeachment was unnecessary. However, the question itself implies the existence of a fact which has not yet been proven and, without perfection, diminished the credibility of the defendant and constituted error.

### III

■ Defendant contends that the trial court erred by limiting his cross-examination of Marie regarding DCFS charges against her. We disagree.

Cross-examination should be directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities. (*Davis v. Alaska* (1974), 415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110.) However, the latitude of inquiry is within the trial court's discretion and will only be reversed where an abuse of discretion results in prejudice to the defendant. *People v. Thompkins* (1988), 121 Ill. 2d 401, 441-42, 521 N.E.2d 38.

Here, during cross-examination of Marie, defense counsel posited the following questions:

"Q. MS. HAYASHI [Defense Counsel]: And back in March of 1986, you were also charged with neglect by the Department of Children and Family Services?

A. MARIE HENRY: That was not—

MR. VICTORSON [Assistant State's Attorney]: Objection.

THE COURT: What date was this?

Q. MS. HAYASHI [Defense Counsel]: March 29, 1986.

THE COURT: The objection is sustained.

Q. MS. HAYASHI [Defense Counsel]: Well, two of your children are in foster care now, are they not?

A. MARIE HENRY: Yes, they are.

Q. And would that be Ernie?

A. Ernie and Denise.

Q. Are you going to be able to get those children back?

MR. VICTORSON [Assistant State's Attorney]: Objection.

MS. WOLOSHIN [Assistant State's Attorney]: Objection.

THE COURT: Sustained."

This line of questioning was irrelevant and improper.

### IV

Defendant contends that the trial court violated its motion *in limine* when it permitted the State to cross-examine defendant on the extent of Ernie's sister's injuries. We disagree.

Although the admissibility of evidence may depend upon whether the probative value of the evidence outweighs its prejudicial effect to the defendant, generally what is relevant is admissible. (*People v. Monroe* (1977), 66 Ill. 2d 317, 321-23, 362 N.E.2d 295.) Relevancy is established where the evidence offered tends to prove a fact in controversy or renders a matter in issue more probable. *Monroe*, 66 Ill. 2d at 321.

■ Applying this rule to the case at bar, we find that no violation occurred. The motion *in limine* restricted mention of possible chastisement which *defendant* inflicted on the victim's sister. The testimony in question involved the State's questioning of defendant about the kind of injuries he noticed on the victim's sister after her real father (Skip or "Irscon [*sic*]" Wilson) allegedly returned them from a visit on July 23, 1987. Defendant's defense was that Skip inflicted such injuries on both Ernie and his sister, and defendant testified on direct examination that he had observed injuries. Therefore, such testimony was relevant.

### V

Defendant contends that the trial court abused its discretion by refusing defendant's request for a continuance. We disagree.

Whether to grant a continuance is within the sound discretion of the trial court (*People v. Young* (1989), 128 Ill. 2d 1, 27, 538 N.E.2d 453), and reviewing courts will not interfere with the trial court's grant or denial of a continuance absent clear abuse of discretion. *People v. Collins* (1985), 106 Ill. 2d 237, 281, 478 N.E.2d 267.

In reviewing the exercise of the court's discretion, when a continuance is sought to secure the presence of a witness, reviewing courts must consider whether (1) the defendant has demonstrated a diligent effort to have the witness present, (2) the witness' testimony is material and might affect the outcome of the case, and (3) defendant has been prejudiced in his right to a fair trial. *People v. Sargent* (1989), 184 Ill. App. 3d 1016, 1022, 540 N.E.2d 981.

■ Defendant did not demonstrate a diligent effort to secure these witnesses. During his motion for continuance, he stated that he had prepared, but never served, the subpoena meant for defendant's brother. Further, defendant's brother's testimony was immaterial and

would not have affected the outcome of the trial. Defendant wanted his brother to confirm that defendant was visually impaired and also to corroborate defendant's assertion that because he had retained counsel on a pending, unrelated charge, he had instructed his brother to call counsel for this charge.

However, other witnesses, including defendant, testified to his impaired vision. Further, whether defendant had instructed his brother to call counsel was of no probative value.

## VI

Defendant asserts that certain alleged discovery violations denied him a fair trial. We disagree.

Specifically, defendant asserts that the State purposefully failed to produce discovery letters which defendant had written to Marie while incarcerated, a bond motion filed by defendant while he was in jail, and statements made by defendant to his probation officer.

Supreme Court Rule 412(a) requires disclosure to the defense of intended witnesses, their written or oral statements or summarizations thereof, and any papers which the State intends to use or which were obtained from or belong to the defendant.

To establish a discovery violation which would warrant a new trial, a defendant bears the burden of establishing (1) that the evidence was favorable to him, (2) that the prosecutor failed to disclose the evidence after a specific request, and (3) that the evidence was material. *People v. Blount* (1991), 220 Ill. App. 3d 732, 745, 580 N.E.2d 1381.

■ Defendant has not met his burden. Generally, rebuttal evidence is not discoverable. In this case, the State asserts that its utilization of such evidence was contingent upon defendant's testimony at trial. There was no failure to disclose after a specific request. Defendant testified that his cell mate helped him write those letters to Marie and that a friend helped him write his bail bond motion. The evidence was material because it reflected on defendant's credibility.

## VII

Defendant contends that it was error for a State witness to testify about observing defendant lift a man and throw him down. We agree.

> "[A] defendant's prior misconduct is not admissible for the purpose of establishing his bad character or propensity to commit illegal or immoral acts, because the prejudicial impact of

such evidence outstrips its negligible probative value." *People v. Hendricks* (1990), 137 Ill. 2d 31, 52, 560 N.E.2d 611.

■ Here, the State asked Humes whether she had ever seen a demonstration of defendant's strength. The trial court overruled defendant's objection and Humes testified that she saw defendant "pick up this gentleman and just put him down in the chair." The prosecutor then rephrased the question in the following manner:

"Q. MR. VICTORSON [Assistant State's Attorney]: And he picked him up and threw him down into [sic] chair?"

The prosecutor then rested. The question so expressed constituted error because it represented a bad act.

Further, we question the relevance of such an inquiry. Here, the victim was a two-year-old boy and defendant was a male adult. The probative value of this testimony is obscure, the prejudice clear.

## VIII

■ Defendant contends that the State's rebuttal closing arguments were prejudicial. We disagree. At issue is the State's commenting on defendant's failure to call certain defense witnesses.

Where defense counsel provokes or invites a response, defendant cannot complain that the State's reply denied him a fair trial. *People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291.

During opening statement, defense counsel told the jury:

"Why do we caution you to listen very carefully to her [Marie's] testimony and we want you to listen to the testimony. And the other witnesses that are going to talk about conversations that they've had with Marie Henry, when she told at least four different people already four different things."

This did not materialize at trial. Hence, in rebuttal closing, the State indicated:

"In opening statement, you heard that you would be hearing from a family member that Marie said something different. Did you?"

Defendant's objection was overruled. Defendant's objection to this was premised on the fact that this family member (defendant's brother) was the one who would testify in this regard. However, defendant's brother did not testify. These comments were proper.

The second assertion of error arose from the following statements made by defense counsel during closing argument:

"And, also, if Carl's statements as to his eye problems, the operations that he received, the doctors that attended him were not the absolute truth, these two experienced attorneys would

have brought in either medical records of doctors who would have testified in rebuttal, gee, I don't know this guy, Carl Williams, and I never, I never attended him or never operated on him when he was two-and-a-half or 15 or 16. That never happened because what Carl said as to his eye problems is the whole and absolute truth."

In rebuttal, the State replied:

"Same thing with the doctors. Why didn't we bring in his doctors to say it wasn't true about his eyes? We heard the names of those doctors yesterday. And all we heard was a last name. Dr. Brunox (phonetic) or something like that. We are supposed to find him? They are his doctors. Why weren't they here."

These comments were legitimately responsive and, therefore, proper.

## IX

Defendant contends that the trial court erred in allowing Dr. Aguilara to testify that he indicated on Ernie's medical report that he suspected child abuse as being the cause of Ernie's injuries. We disagree.

Expert testimony is proper only when the subject matter is of such a character that only persons with special skill or experience in a particular area are capable of forming a judgment regarding the applicable facts, and if the jury is competent to determine the facts at issue, expert opinion should not be admitted. *People v. Perry* (1986), 147 Ill. App. 3d 272, 275, 498 N.E.2d 1167.

■ Here, defendant stated that the doctor's comments constituted a legal conclusion which invaded the province of the jury. However, child abuse was not an ultimate issue in this case. Unlike *Perry*, the doctor in this case did not testify as to the ultimate issue.

## X

Defendant contends that the trial court erroneously denied his motion to suppress his statements. We disagree.

Specifically, defendant asserts that the trial court erred in denying his motion to suppress because he told the police that he wished to speak with his attorney and that he had retained counsel in an unrelated, pending case.

A reviewing court will not set aside a trial court's ruling on a motion to suppress unless it is clearly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 99, 440 N.E.2d 869.) Nor will a court of review substitute its judgment when the evidence is conflicting, for it is within the

jury's province to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.

Defendant asserts that he asked for an attorney. However, Sergeant Jones testified that he spoke with defendant at the hospital and read him his rights. Defendant said that he understood his rights and agreed to speak to Jones. Later, at 6 p.m., at Area 6, Detective Ryan testified that he read defendant his rights again. After each right was read, defendant said that he understood and agreed to talk with the detective. Assistant State's Attorney Mondello (Mondello) testified that she advised defendant of his rights and he stated that he understood each of these rights and agreed to talk. After Mondello wrote down defendant's confession, she returned to him and asked him to read aloud the typewritten portion of the statement which contained the *Miranda* rights. Defendant obliged.

The only evidence adduced at trial which supports defendant's claim is his own testimony. Other testimony indicated that at no time did defendant ask any of these three individuals for an attorney.

The question, then, is one of credibility of the witnesses. The record supports the trial court's finding and the jury's verdict supports the trial court's denial of defendant's motion to suppress.

## XI

Defendant contends that his 60-year incarceration sentence was excessive and constituted an abuse of discretion because the trial court did not consider his rehabilitative potential. We disagree.

At issue is the following comment:

> "As far as rehabilitation is concerned, I've always maintained there is very little rehabilitation anyplace in the penitentiary or in incarceration. Penitentiaries are for punishment, and that is what this for, punishment."

Sentencing is a matter of discretion possessed by the trial court and, absent an abuse of that discretion, the sentence may not be altered on review. *People v. Willingham* (1982), 89 Ill. 2d 352, 364, 432 N.E.2d 861.

The trial court's comment, while harsh, indicates, in effect, that it does not consider the penitentiary system to be rehabilitative of prisoners and that the reality is that persons who are sentenced to the penitentiary are being punished. The trial court has discretion relative to the punishment to be imposed. We find no abuse of discretion in this case.

## XII AND XIII

Defendant contends that the cumulative effect of the errors deprived him of a fair trial. We agree. Defendant also contends that he was not proven guilty of attempted murder beyond a reasonable doubt.

 The cross-examination of defendant regarding information he reportedly gave to a probation officer about employment and also regarding what he allegedly told a friend about the child's injuries was erroneous and prejudicial. The testimony by the State's witness about observing defendant lift a man and throw him into a chair was also erroneous and prejudicial. The principal charge in this case was attempted murder. The proof of this offense requires a specific intent to kill. Intent to do bodily harm is insufficient. The seriousness of the injury alone is insufficient. To prove attempted murder, the State must demonstrate that the defendant possessed the criminal intent to kill. (*People v. Solis* (1991), 216 Ill. App. 3d 11, 17, 576 N.E.2d 120.) A defendant's specific intent may be inferred from the nature of the assault and surrounding circumstances. *Solis*, 216 Ill. App. 3d at 17.

Although the injuries were extreme in this case, we cannot say that, without the errors, proof of specific intent is overwhelming. Although the law does not require a perfect, error-free trial, the law does require that parties receive a fair one. *People v. Szabo* (1991), 144 Ill. 2d 525, 531, 582 N.E.2d 173.

Defendant urges in his myriad of arguments offered to justify a new trial that he has been prejudiced. (See *People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206.) The errors which occurred during the trial are connected with defendant's contention that he was not proven guilty of attempted murder beyond a reasonable doubt.

Reviewing courts should not disturb criminal convictions unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261.

The reasonable doubt standard should be applied in reviewing the sufficiency of the evidence in all criminal cases, whether the evidence is direct or circumstantial. *People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344.

On review, the question is whether,

> "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Without the errors which occurred in this trial (permitting a witness to testify to a bad act which demonstrated defendant's strength when the victim was a toddler, coupled with erroneous court rulings and unperfected impeachment testimony about defendant's employment history and what defendant reportedly said to a friend about the child's injuries), we cannot say that the jury would have found defendant guilty of attempted murder beyond a reasonable doubt.

For the foregoing reasons, we reverse and remand for a new trial.

Reversed and remanded.

MURRAY and McNULTY, JJ., concur.