2025 IL App (1st) 220427-B

FIFTH DIVISION
October 17, 2025

No. 1-22-0427

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
|     Plaintiff-Appellee, | ) | Cook County, |
| | ) | Criminal Division |
| v. | ) | |
| | ) | No. 19 CR 14458 |
| CECIL SMART, | ) | |
| | ) | The Honorable |
|     Defendant-Appellant. | ) | Carol M. Howard |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Mikva dissented, with opinion.

**OPINION**

¶ 1 Cecil Smart was charged with three counts of aggravated criminal sexual abuse based on allegations that he sexually abused a 16-year-old boy named J.P. Count I alleged that Smart knowingly committed an act of sexual penetration upon J.P. by putting his mouth on J.P.'s penis, count II alleged that Smart touched J.P.'s penis with his hand for the purpose of sexual gratification, and count III alleged that Smart knowingly committed an act of sexual conduct upon J.P. by causing J.P.'s hand to touch Smart's penis. In a bench trial, the court convicted Smart of the first two counts, but found him not guilty on the third count, and sentenced him to 30 months of probation.

¶ 2    After the court denied Smart's motion for a new trial, he appealed and argued that (1) the trial court reversibly erred by admitting other acts evidence and (2) he received ineffective assistance of counsel. On September 15, 2023, we reversed and remanded after finding that the trial court reversibly erred when it admitted other acts evidence. *People v. Smart*, 2023 IL App (1st) 220427. On June 5, 2025, our supreme court reversed. *People v. Smart*, 2025 IL 130127. Although it agreed that the trial court's decision to admit other acts evidence was improper, it found the admission of this evidence was harmless. *Id.* ¶ 110. Therefore, it remanded for us to consider the merits of Smart's ineffective assistance claim. *Id.* ¶ 111. After considering his ineffective assistance claim, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4    In 2018, when J.P. was 16 years old, he spent the summer with his older sister, Ciera S., who lived in Chicago and worked for Breakthrough Urban Ministries (Breakthrough). While in Chicago, J.P. volunteered at Breakthrough. Smart used to work at Breakthrough as well, and he and Ciera became friends. By the time J.P. started at Breakthrough, Smart had already been terminated by Breakthrough, but Ciera and Smart continued to socialize. Multiple witnesses testified that Ciera was romantically interested in Smart, but Smart only wanted to be friends. Smart lived with his brother, Frank; Frank's partner, Amanda; and Frank and Amanda's children.

¶ 5    When J.P. came to Chicago, Ciera introduced him to Smart, and afterwards, Smart invited J.P. along when he took his nephews on various outings. First, Smart invited J.P. to go to the zoo. The night before their trip, J.P. spent the night at Smart's house because Ciera had to work early the next morning and did not think she would have time to drop him off. Smart directed J.P. to sleep next to him in his bed, and the two slept side by side without incident.

¶ 6    Several weeks later, Smart invited J.P. to go with him and his nephews to see fireworks at Navy Pier, and J.P. accepted. J.P. testified that in the car on the way to the fireworks show he saw Smart drinking what he believed was alcohol. J.P. said that when Smart offered him the alcohol, he drank some because he "kind of felt pressured" to do so. By the time Smart, J.P., and Smart's nephews arrived at Navy Pier, the fireworks were already over, so they looked at the city skyline for a while. Then, they stopped at McDonald's for food and returned to Smart's house to eat. J.P. testified that Smart offered him more alcohol at the house and that he drank about "two shots worth," which made him feel sick. J.P. then threw up in the kitchen, and Smart cleaned it up.

¶ 7    Afterwards, J.P. took a shower and then went to bed. He testified that he slept in Smart's bed because that is where he slept the last time he stayed over. According to J.P., Smart got in bed with him, and shortly thereafter, Smart "started touching [him]." J.P. said that he kept his eyes closed and pretended to be asleep. Smart then pulled down J.P.'s shorts and underwear, started stroking J.P.'s penis, and then put his mouth on J.P.'s penis. J.P. testified that even though his eyes were closed, he could tell Smart's mouth was on his penis because he heard Smart's breath and felt his beard. Smart rubbed his penis against J.P.'s closed fist as well. J.P. testified that he did not cry out or fight back at any time because he was "scared" of what Smart might do and because he believed "nobody would be able to help [him]." Testimony established that Frank and Amanda were home that night, as well as Smart's niece and nephews. Smart admitted that he and J.P. slept in the same bed that night but denied J.P.'s allegations of sexual abuse.

¶ 8    J.P. testified that the morning after his encounter with Smart he texted his friend M.T. and told her "everything that happened." He explained that he did not tell his mom or sister what Smart had done to him because he did not want them to worry. It was not until several months

later, in October 2018, that J.P. finally told his mother and sister what had happened. He then reported the incident to police.

¶ 9                                    II. ANALYSIS

¶ 10     Smart contends that defense counsel was ineffective because he (1) failed to object to other-crimes evidence that the court had already deemed inadmissible, (2) stipulated to the admission of some of the same inadmissible evidence, (3) failed to object to improper hearsay evidence, and (4) repeatedly referenced the same inadmissible hearsay evidence at trial. The State argues that defense counsel's decisions were strategic ones and that Smart cannot demonstrate the requisite prejudice.

¶ 11     We review ineffective assistance of counsel claims *de novo* (*People v. Bates*, 2018 IL App (4th) 160255, ¶ 46), and analyze them under the two-part test announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under the first part of this test, a defendant must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Under the second part of the test, a defendant must show that he was prejudiced by counsel's mistakes. *Id.* at 687.

¶ 12     A. Counsel's Performance Fell Below an Objective Standard of Reasonableness

¶ 13     To show counsel's deficient performance, a defendant must overcome the "strong presumption" that counsel's decisions were the product of "sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). A defense attorney performs unreasonably where he fails to use the rules of evidence to preclude improper or harmful facts at trial. *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996).

¶ 14     1. *Defense Counsel's Stipulation and Failure to Object to Previously-Excluded*

*Prior Acts Evidence*

¶ 15     Before trial, the State moved to admit the following other-crimes evidence: (1) a 2012 incident where Smart allegedly gave alcohol to an 18-year-old male student athlete when he was coaching basketball at Sterling College in Kansas, (2) a March 2018 incident where Smart was alone with a male teenage student in violation of Breakthrough's policy, and (3) a June 2018 incident where Smart drove a male teenage Breakthrough student home and touched his buttocks. The court admitted the June 2018 incident, but excluded the 2012 Sterling College incident and the March 2018 Breakthrough incident because it found that any probative value of this evidence was "far outweighed by its prejudicial effects."

¶ 16     Yet, the State cross-examined defense witnesses about both of the excluded incidents. First, the State asked Smart's character witness, Robert Muzikowski, if he was "aware of the fact that [Smart] was reprimanded for being alone with a student and drinking with a student when he was an employee at Sterling College in Kansas?" Muzikowski responded that he was not. Then, the State asked Frank if he knew Smart "was reprimanded at [Sterling College] for being alone with a student and drinking alone with a student too?" Frank also said he was unaware of the Sterling College incident. The State questioned Smart about the incident as well, asking, "you were reprimanded when you were work[ing] at Sterling College, correct?" and "What happened at Sterling College?" Despite the court's *in limine* ruling, defense counsel failed to object to any of the State's questions.

¶ 17     The State also elicited testimony about the previously excluded March 2018 incident at Breakthrough, asking Smart if it was true that he was "alone with a child against [Breakthrough] policy." Defense counsel did not object to the State's question, and Smart initially denied the

allegation. Afterwards, the State announced that it planned to call Breakthrough's human resources director, Marcie Curry, to "rebut some of the things [Smart] said about his *** employment at Breakthrough Ministries." After learning that Curry was unavailable to testify that day, defense counsel objected to a continuance and instead agreed to stipulate that if called, Curry would testify that

> "on June 22nd, 2018, [Smart] was notified by mail that he was terminated from employment at Breakthrough Ministries due to the fact that on June 12th, 2018, while transporting a participant, [E.L.], home it was alleged that [Smart] touched [E.L.] inappropriately. On March 29th, 2018, it was discovered that [Smart] was working with a program participant alone in the family plex prayer room, and that because of these policy violations of never working alone with students, Cecil Smart, this defendant, received a verbal warning, and both of these established policies were reviewed during a team meeting, which was held on February 19th, 2018, in which [Smart] acknowledged attendance. She would further state that as a culmination of policy violations, [Smart's] employment at Breakthrough Urban Ministries was terminated effective June 21st, 2018."

¶ 18    During closing arguments, the State relied upon this previously-excluded other acts evidence to argue that Smart "engag[ed] in a pattern of abuse against boys." The State argued that "a few months before [Smart met J.P.] he is reprimanded for being alone with a student. A child who is approximately the same age as [J.P.], a male child, a few months before. Despite that reprimand, he then is in a car one month before this incident with [another teenage male student] driving him home and slaps his butt." The State relied upon this evidence to argue that

this "pattern of abuse against boys *** culminated in him raping [J.P.]." Again, defense counsel did not object.

¶ 19    Smart contends that defense counsel was ineffective for failing to object to and, even worse, stipulating to other-crimes evidence after the court had already deemed this evidence inadmissible because of its "prejudicial effects."

¶ 20    While we must be "highly deferential" to counsel's strategic choices at trial (*People v. Perry*, 224 Ill. 2d 312, 344 (2007)), we will find counsel's performance deficient where counsel's actions "appear[ ] so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. King*, 316 Ill. App. 3d 901, 916 (2000). While generally, what to object to and when to object are matters of trial strategy, an attorney is expected to use "established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts." *Id.* (quoting *Moore*, 279 Ill. App. 3d at 159).

¶ 21    The State argues that defense counsel's failure to object to the State's repeated references to inadmissible other-crimes evidence here was a matter of sound trial strategy, but we cannot conceive of a reason why defense counsel did not object and even stipulated to evidence that he had already persuaded the court to exclude precisely because its probative value was "far outweighed by its prejudicial effects." The State asserts that defense counsel's failure to object was a "smart decision" because it "allowed the trial court to hear that [Smart] did *not* commit these prior acts." But neither Frank nor Muzikowski said that Smart *did not* commit these prior acts; instead, they simply said they were "unaware" whether Smart had been reprimanded for "being alone with a student and drinking with a student" at Sterling College. And although Smart initially denied that he had been alone with a student at Breakthrough in March 2018, defense

7

counsel's stipulation to Curry's testimony confirmed that Smart did in fact "work[ ] with a program participant alone in the family plex prayer room" in violation of Breakthrough's policy. Smart similarly denied that he was "reprimanded" when he worked at Sterling College, but ultimately acknowledged that "[his] name came up" after he "cut a kid [from the basketball team] at the collegian level" and that the kid's father then "tried to sue the school."

¶ 22 We can discern no sound strategic reason for defense counsel's failure to object at any point, and stipulating to boot, to other acts evidence that he had convinced the trial court to exclude prior to trial. See *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 76 (finding defense counsel's decision to elicit testimony about defendant's other charges "did not constitute sound trial strategy" because under the court's pretrial ruling, "such evidence was to be excluded"). This other-crimes evidence was damaging because it depicted Smart as a man who routinely isolated male teenagers and then engaged in inappropriate conduct with them, making it more likely he was guilty of sexually abusing J.P. on the date in question. See *People v. Foreman*, 2019 IL App 3d 160334, ¶ 31 ("[t]he erroneous admission of other-crimes evidence carries a high risk of prejudice and will ordinarily require a reversal"). Therefore, we find that defense counsel's failure to object and his agreement to stipulate to evidence that he had previously convinced the trial court to exclude fell below an objective standard of reasonableness.

¶ 23 2. *Defense Counsel's Failure to Object to Evidence About J.P.'s Text Messages to M.T. and His References to this Testimony*

¶ 24 Smart also argues that defense counsel's performance was deficient because he failed to object to improper hearsay evidence and repeatedly referenced the same inadmissible hearsay evidence at trial. The State again argues that defense counsel's decisions were strategic.

¶ 25    The State filed a motion *in limine* "regarding excited utterance" but withdrew it before trial. Although defense counsel requested a hearing on the motion, the court determined one was unnecessary because the State had already withdrawn its motion. In his opening argument, defense counsel argued that the evidence would be insufficient to convict Smart because there was "no prompt complaint" by J.P. He stated, "I'm assuming that by withdrawing [its motion, the State is] saying that *** the complaint that [J.P.] made to [M.T.] was not a prompt complaint." He explained that J.P. had apparently sent a text message to his friend, M.T., the morning after the alleged assault and told her that Smart had sexually assaulted him. Defense counsel argued that because text messages are "the most egregious hearsay," any alleged texts J.P. sent were inadmissible. The court interrupted defense counsel and encouraged him to move on, reminding him that opening arguments are "designed to present what you think the evidence will show[,] not make closing argument."

¶ 26    During direct examination, the State asked J.P. what he did the morning after the alleged assault. J.P. said he texted his friend M.T. "everything that happened." When the State asked J.P. why he chose to text M.T. instead of call, he said that it was because Smart was still in the room with him, and he did not want Smart to know that he knew "[w]hat happened the night before." The State then asked J.P. if he had a "personal plan" for the next day, because he was supposed to spend the day at the museum with Smart and his nephews. J.P. testified that he and his friend M.T. "came up with a safe word and if I texted her that that means that something progressed or something didn't progress *** we decided I had to hang with the kids so if the kids would go in the ball pit I would go in the ball pit with them, anything to not leave me alone with [Smart]." J.P. testified that on the way home from the museum, Smart's car was breaking down, and he

continued to text M.T. "I hope the car breaks down so I don't have to go back to [Smart's] house." Defense counsel did not object to any of the State's questions or to J.P.'s responses.

¶ 27    During cross-examination, defense counsel questioned J.P. about the texts he sent to M.T, asking if he was "texting about [Smart] who was laying next to you?" J.P. confirmed that he was.

¶ 28    During closing arguments, the State said it was "significant" that J.P. testified that he "sent a text message to [his] friend" M.T. the morning after the assault and "detailed what happened *** the night before."

¶ 29    Despite J.P.'s testimony about the text messages, the court found "there was no immediate outcry" because J.P. did not report the alleged assault to his sister, mother, or the police until several months later. The court said that "in terms of proof beyond a reasonable doubt, [J.P.'s] failure to make an immediate outcry puts this case in a little different posture." The court noted that "we don't have any physical evidence in this case," and J.P.'s failure to outcry "until months later, does raise questions."

¶ 30    In response, the State argued that "we do have immediate outcry. I wasn't allowed by law because [J.P.] was over 13 to get into the contents of that outcry, but he tells [M.T.] from the bed immediately [what Smart had done to him]." The State added that J.P. texted M.T "a couple of hours after having been sexually assaulted *** over and over again during the night."

¶ 31    Defense counsel argued in response that there was "no valid legal outcry or complaint in this instance when there was ample opportunity to do so" and that when J.P. did "apparently mention t[he] incident to anyone, it's by way of a text, which is *** inherently objectionable [hearsay] because it allows time for the declarant or the texter to reflect and to invent."

¶ 32    "Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matters asserted." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 30. The term

" '*matters asserted*' " includes those directly expressed and those the declarant " necessarily implicitly intended to express.' " (Emphasis in original.) *Id.* (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.1, at 635-36 (6th ed. 1994)). "Unless hearsay falls within an exception to the hearsay rule, it is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant." *Id.* ¶ 31.

¶ 33    "It is the general rule that a witness may not testify as to statements she made out of court for the purpose of corroborating her testimony given at trial." *People v. Davis*, 130 Ill. App. 3d 41, 54 (1984) (finding it was reversible error to admit a victim's prior consistent statements that after the crime, she told a friend, her mother, and a police officer she had been robbed and beaten); *People v. Williams*, 228 Ill. App. 3d 981, 1007-08 (1992) (finding it was error to admit a witness's prior consistent statement—that he "t[old] those police the same thing [he was] telling this jury" (internal quotation marks omitted)—because it corroborated the witness's testimony on direct exam); *People v. Henderson*, 142 Ill. 2d 258, 310-11 (1990) (finding it was error to admit a witness's prior consistent statement because it was "possible" the jury saw the witness as "more credible because he said he had given the police the same account four days after the murder, and people are more apt to believe what is repeated").

¶ 34    In this case, J.P.'s testimony—that he texted M.T. about "everything that happened" with Smart the morning after the alleged assault and that he and M.T. came up with a "safe word" and a "personal plan" so that he could avoid being alone with Smart the next day—was inadmissible hearsay because it was offered by the State to establish that J.P. had "detailed" the sexual assault to M.T. the morning after it occurred. The State argues that J.P.'s testimony about the text messages was not hearsay at all, because there "was nothing about what was actually in those texts" and "there was nothing elicited as to what 'happened' to J.P." But this ignores the fact that

just prior to the State's questions about the text messages, J.P. had described, in detail, the sexual assault by Smart. Therefore, J.P.'s testimony about the text messages he sent to M.T., which communicated to the court that he told M.T. "everything that happened" about the sexual assault right after it occurred, was inadmissible hearsay. This testimony was elicited by the State on direct examination and was offered for its truth, as evinced by the prosecutor's closing argument, where she argued it was "significant" that J.P. testified that he "sent a text message to [his] friend" M.T. the morning after the assault and "detailed what happened *** the night before."

¶ 35    Nor were J.P.'s statements admissible under the limited exception to the hearsay rule for prior consistent statements. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52 ("[t]he general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the witness's trial testimony, because they serve to unfairly enhance the credibility of the witness"). J.P.'s testimony about the text messages was not offered by the State for rehabilitative purposes and instead was used by the State during its direct examination of J.P. to improperly bolster and lend credibility to his trial testimony. See *People v. Denis*, 2018 IL App (1st) 151892, ¶ 80 (finding that a witness's prior consistent statements should not have been admitted into evidence because the testimony "was *not* elicited to rebut a charge of recent fabrication or an inference that [the witness] was motivated to testify falsely" and instead was elicited on direct examination to enhance the witness's credibility (emphasis in original)).

¶ 36    The State argues that defense counsel's failure to object to testimony about the text messages and his decision to talk about the texts messages at trial was a "strategic move," because it "point[ed] out that J.P. did not text his sister, who lived in the same city," someone who could have "physically help[ed] him in that moment" but instead texted his friend M.T., who lived hundreds of miles away. But defense counsel could have made those very arguments

12

without any reference to the damaging text messages. We can see no reason why defense counsel did not object to—and even elicited—additional information about the contents of J.P.'s text messages to M.T. when these messages bolstered J.P.'s credibility at trial by confirming that he told M.T. about the sexual assault just hours after the attack and evinced his desperation to avoid being alone with Smart again. For these reasons, we find defense counsel's performance was deficient. See *People v. Levesque*, 256 Ill. App. 3d 639, 644 (1993) ("not every decision of counsel, no matter how misguided, may be swept under the boundless rug of 'trial strategy' ").

¶ 37                    B. Smart Was Prejudiced by Counsel's Deficient Performance

¶ 38    We turn now to the question of prejudice. Under the second part of the *Strickland* test, a defendant must show that he was prejudiced by defense counsel's mistakes. *Strickland*, 466 U.S. at 687. "Prejudice exists where there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different." *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005) (citing *Strickland*, 466 U.S. at 694). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceedings. *Strickland*, 466 U.S. at 694.

¶ 39    Smart argues that defense counsel's deficient performance prejudiced him, requiring reversal and remand for a new trial. The State counters that even if defense counsel's performance was deficient, any errors were harmless. The State relies heavily upon the presumption that in a bench trial, the court "consider[s] only competent evidence in reaching its finding" (*People v. Naylor*, 229 Ill. 2d 584, 603 (2008)) and contends that because the court

made "zero mention" of other acts evidence, of a "pattern," or of J.P.'s text messages to M.T. in reaching its decision, there was no prejudice here.

¶ 40     In its review of our earlier decision, our supreme court found that the trial court's decision to admit evidence of the June 2018 incident where Smart touched the buttocks of a Breakthrough student was improper but concluded that any error was harmless because the case was a bench trial and the trial judge "did not refer to the evidence of other misconduct at all in her summary of the evidence supporting the convictions." *Smart*, 2025 IL 130127, ¶ 104. In dissent, Justice O'Brien found there was "a reasonable probability [Smart] would have been acquitted absent the admission of the prior misconduct evidence" (*id.* ¶ 125 (O'Brien, J., dissenting, joined by Cunningham, J.)), reasoning that because the trial court admitted the improper other acts evidence over Smart's objection and denied his motion for a new trial based on the admission of the same evidence, this demonstrated the trial court's belief that "the inadmissible evidence could properly be considered when determining defendant's guilt," which "rebut[ed] the general principle that the trial court in a bench trial is presumed to disregard improperly admitted evidence." *Id.* ¶¶ 119, 120.

¶ 41     Although the trial court did not expressly reference any of the improperly admitted other-crimes evidence when announcing its decision, the 2012 Sterling College incident, the March 2018 Breakthrough incident, and the June 2018 butt-touching incident permeated Smart's trial and were highly prejudicial because they depicted Smart as a man who routinely used his position of authority to isolate teenage young men. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (other-crimes evidence is highly prejudicial because it risks suggesting the disfavored notion that, because a person has committed other similar crimes, he or she is more likely to have committed the crime question); *Foreman*, 2019 IL App (3d) 160334, ¶ 31 (the improper

14

admission of other-crimes evidence carries a high risk of prejudice and "will ordinarily require a reversal" (citing *People v. Cortes*, 181 Ill. 2d 249, 285 (1998))). The State referenced this other acts evidence when it cross-examined Frank and Muzikowski, asking if they were "aware of the fact that [Smart] was reprimanded for being alone with a student and drinking with a student when he was an employee at Sterling College in Kansas?" The State then questioned Smart about the 2012 incident, asking, "What happened at Sterling College?" It also asked Smart about the incidents that resulted in his termination from Breakthrough. Our supreme court did not consider the effect of these improper cross-examination questions in its prejudice analysis because it found that Smart forfeited the issue by failing to object to these questions at trial. *Smart*, 2025 IL 130127, ¶ 77. However, it was defense counsel's failure to object to this other acts evidence, coupled with evidence of the June 2018 butt-touching incident, that allowed the State to argue during closing argument that Smart had "a pattern of taking jobs that put him around children in places where he can be alone with children and ingratiate himself to children and their families so that he can be alone with them and then abuse them." After the court voiced its concerns about the strength of the State's case, the State argued, "Judge, you have enough. You have enough to find the defendant guilty. You should find the defendant guilty. The defendant has engaged in a pattern of abuse against boys, it culminated in him raping [J.P.]."

¶ 42    In a case that turned solely on the credibility of Smart and J.P., where there was no physical evidence and there were no other eyewitnesses, J.P.'s credibility was critically important. The State's repeated references to the other-acts evidence during trial and its reliance upon Smart's prior acts to argue there was a "pattern of abuse against boys" during closing argument cast doubt on Smart's testimony that he never touched J.P. and gave credence to J.P.'s testimony. *Cf. Hampton*, 2021 IL App (5th) 170341, ¶ 77-78 (finding no prejudice where the

State's failure to "cross-examine the defendant about his other charges or mention them during closing argument" tended "to mitigate the prejudicial effects of other-crimes evidence," especially when the evidence of defendant's guilt was overwhelming).

¶ 43    While the court did not reference J.P.'s text messages to M.T. when announcing its decision either, these text messages also permeated Smart's trial and improperly bolstered J.P.'s in-court testimony. See, *e.g.*, *People v. Tidwell*, 88 Ill. App. 3d 808, 810-11 (1980) (finding that the admission of a witness's out-of-court testimony, which "paralleled" his in-court testimony, was not harmless, because it "impl[ied] that the witness's court testimony [was] true because he told the same story on a previous occasion"). After the trial court expressed its skepticism of the State's case because "no outcry was made [by J.P.] until months later" and indicated that this "raise[d] questions," the State argued that it was "significant" that J.P. texted M.T. just "a couple of hours after having been sexually assaulted," and relied upon the text messages to argue "we do have immediate outcry" because J.P. "detailed what happened *** the night before" in these messages to M.T. After the State made its closing argument, the court acknowledged that the State's case "rises and falls with the testimony of [J.P.]."

¶ 44    "Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene." *People v. Emerson*, 97 Ill. 2d 487, 502 (1983). The State's repeated references to highly prejudicial other acts evidence undermined Smart's credibility, and its references to J.P.'s text messages to M.T. bolstered J.P.'s version of events. Defense counsel failed to object to the State's improper questions or the witnesses' answers, stipulated to highly prejudicial prior acts evidence that he had previously fought to exclude, and then elicited further testimony about these multiple lines of inadmissible evidence. Although the court did not say it relied on this evidence when announcing its decision, it allowed

the evidence to be admitted at trial in contravention of its own prior rulings, denied Smart's motion for a new trial based in part on its erroneous admission of prior acts evidence, expressly stating that the State's motion to allow proof of other crimes was "properly granted and complied with", and did not say that the improper evidence did not factor into its decision. *Cf. People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 261 (finding that the defendant failed to rebut the presumption that the trial judge considered only properly admitted evidence where the trial court "expressly indicated" that it considered the inspector general's testimony solely to explain the steps of his investigation, and not for an impermissible purpose); *People v. Brajcki*, 150 Ill. App. 3d 506, 515 (1986) (the defendant failed to rebut the presumption that the trial court considered only proper evidence, finding it "significant that the court specifically disclaimed reliance on any evidence of alcoholic intoxication"); *People v. Quintero*, 2023 IL App (3d) 200302-U, ¶¶ 69, 71, 74 (holding that the erroneous admission of other-acts evidence was harmless in a bench trial where the evidence was not a "focal point" of the trial, where the trial court never mentioned it, and where the court "expressly stated that its guilty finding was based on [one witness's] credibility," and that "[e]ven without [the other acts evidence], there is no reasonable likelihood that defendant would have been acquitted").

¶ 45     Although there is a presumption that the court in a bench trial disregards inadmissible evidence, this presumption is a rebuttable one. *Naylor*, 229 Ill. 2d at 603-04. At a certain point, the presumption can no longer be indulged. In the seminal case of *People v. Nuccio*, 43 Ill. 2d 375, 394 (1969), our supreme court grappled with the "vexing question" of whether a "pattern of prejudicial and unsupported insinuations [by the State during cross examination of defense witnesses] which would, without question, necessitate a new trial had this case been heard by a jury, *** requires the same result in a bench trial." After a bench trial, the defendant police

officer was convicted of murdering a young man and conflicting testimony had been presented as to whether the young man had thrown a knife at the defendant before the shooting occurred. *Id.* at 376, 379-80. At trial, the prosecutor made "unsupported insinuations of a general pattern of misconduct on the part of the defendant and the two main defense witnesses" when cross-examining them, leading to inferences that the defendant "often intimidated and chastised the youths [including the victim] *** and that the defendant may therefore have been pursuing a general pattern of indiscriminate abuse when he shot [the victim]" and that the defendant and his witnesses had been guilty of perjury in a case involving another young man from the same area. *Id.* at 383. On appeal, the defendant argued that the prosecutor's improper questioning of him and his witnesses deprived him of a fair trial. *Id.* at 376. After finding that the prosecutor's questions were improper, our supreme court turned to the question of prejudice. *Id.* at 383. It stated:

> "The rule [that judges are presumed to disregard inadmissible evidence] as generally
> applied is a sound one. But there are, it seems to us, limits to the immunity to improper
> and prejudicial insinuations which judges are presumed to possess. Stripped of the haze
> created by the innuendoes, the shooting here was either done by an officer who was the
> target of a knife being thrown at him *** as described by defendant and his witnesses, or
> it was the wanton killing testified to by the State's witnesses. Where, as here, the guilt of
> the accused is not manifest, but is dependent upon the degree of credibility accorded by
> the trier of fact to his testimony and that of the witnesses who testify on his behalf, and
> there appear in the record substantial numbers of unsupported insinuations which, if
> considered, could have seriously impeached the credibility of the defendant and his
> witnesses, and there is no indication of the court's awareness of this impropriety even

though it is brought to his attention, it is our opinion that justice and fundamental fairness demand that the defendant be afforded a new trial free from such prejudicial misconduct." *Id.* at 396.

¶ 46 After considering the cumulative effect of the admission of the other acts evidence—some of which was brought to the court's attention—as well as the text messages here, we find there is a "reasonable probability that, absent [defense counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. See, *e.g.*, *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (concluding that reversal was required based on ineffective assistance of counsel when it was "a close case that turned almost exclusively on whether the jury believed [the defendant] or [the victim]," the credibility of the two "would have been of utmost importance to the jury," and a witness's "irrelevant and [highly] prejudicial testimony undercut [the defendant's] credibility"); *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45) ("prejudice may be found even when the chance that minimally competent counsel would have won an acquittal is 'significantly less than 50 percent' " (quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008))). Because this evidence permeated Smart's trial from start to finish, we are not confident that it did not factor into the court's determination of guilt, especially where the court allowed evidence regarding the June 2018 incident, found that J.P.'s testimony was not credible to sustain a conviction on one of the three counts, and then denied Smart's posttrial motion in which he argued that other acts evidence was improperly admitted. *Nuccio*, 43 Ill. 2d at 396 (finding a new trial was warranted where there was "no indication of the court's awareness of [the State's] impropriety even though it is brought to his attention"). Accordingly,

19

we find that defense counsel's deficient performance prejudiced Smart and that reversal and remand for a new trial is required.

¶ 47                                     III. CONCLUSION

¶ 48    For the foregoing reasons, the judgment of the trial court is reversed and remanded for a new trial.

¶ 49    Reversed and remanded.

¶ 50    JUSTICE MIKVA, dissenting:

¶ 51    Prior to remand from our supreme court, I joined the majority in concluding that Mr. Smart's conviction should be reversed based on the trial judge's erroneous admission of evidence. That evidence was a stipulation regarding an incident on June 12, 2018, where Mr. Smart had driven a male teenage student home alone, in violation of his then employer's company policy, grabbed the student's buttocks, and was terminated shortly afterwards.

¶ 52    Our supreme court reversed our previous decision. While it agreed that the admission of this evidence was an error, it found that error to be harmless, holding that "the State ha[d] met its burden of showing there was no reasonable probability that [Mr.] Smart would have achieved a better result without the error." *People v. Smart*, 2025 IL 130127, ¶ 110.

¶ 53    Our supreme court's harmless error analysis in this case rested on *People v. Naylor*, 229 Ill. 2d 584, 603 (2008), in which the court had previously held that, "when a trial court is the trier of fact a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion." While the supreme court acknowledged in this case that the presumption can be rebutted, it held that the presumption was not rebutted by Mr. Smart here because Mr. Smart's "inadmissible acts of misconduct were not a material factor in the [trial] court's decision." *Smart*, 2025 IL 130127, ¶ 106.

20

¶ 54    We were well aware of *Naylor* when we issued our initial decision in this case. We concluded that the presumption that the trial judge in this case did not consider this inadmissible evidence was rebutted by the fact that the trial judge, after considering an objection to the evidence and the argument of the parties, specifically found evidence of the June 12, 2018, incident to be admissible. *People v. Smart*, 2023 IL App (1st) 220427, ¶ 37. This was precisely the situation in *Naylor*, where the presumption that a judge in a bench trial considers only admissible evidence was also found to be rebutted by the trial court's ruling that improper evidence was admissible. *Naylor*, 229 Ill. 2d at 605. The dissenting supreme court justices in this case agreed with us, noting that:

> "With the trial court having initially admitted the improper evidence over defendant's objection and then proceeding to erroneously deny defendant's posttrial motion on the matter, we can only conclude that the trial court believed the inadmissible evidence could properly be considered when determining defendant's guilt." *Smart*, 2025 IL 130127, ¶ 120 (O'Brien, J., dissenting, joined by Cunningham, J.)).

¶ 55    Now, on remand, the majority again reverses, finding Mr. Smart's trial counsel ineffective for failing to object to evidence of other past acts that the trial court had already ruled inadmissible and to text messages, which the majority concludes were inadmissible as consistent out-of-court statements. As the majority recognizes, this failure by trial counsel to object—assuming it rises to the level of unreasonable assistance—requires reversal only if Mr. Smart is able to show prejudice or a "reasonable probability" that but for counsel's deficient performance, the result would have been different. *Supra* ¶ 36.

¶ 56    In our first decision, the burden was on the State to show harmless error, but now the burden is on Mr. Smart to make a showing of prejudice. Our supreme court has already held that we must

21

presume the trial court did not consider the inadmissible evidence of the June 12, 2018, incident, even though the trial court specifically ruled that that evidence was admissible. With all due respect to the majority's careful analysis, given our supreme court's clarifications regarding the strength of the presumption that we must make in this case, I simply do not agree that Mr. Smart has overcome it.

¶ 57    As the majority acknowledges, the trial court never mentioned any of this evidence that the majority finds trial counsel should have objected to. None of this evidence was cited by the trial court or incorporated into its decision. More significantly, an objection by trial counsel to any of this evidence was almost certain to have had no impact on the outcome of this case.

¶ 58    The first failure on the part of trial counsel that the majority points to was Mr. Smart's lawyer's stipulation to and failure to object to questions or testimony referencing previously excluded prior acts. *Supra* ¶¶ 14-21. However, the trial court had already ruled that evidence of those prior acts was inadmissible. Certainly, given the strong presumption of *Naylor*, we are entitled to assume that the trial court adhered to its own prior ruling and did not consider this evidence. Trial counsel may well have concluded the same, choosing not to bring a matter to the court's attention that it had already decided.

¶ 59    The only other failure by trial counsel that the majority points to was counsel's failure to object to J.P. testifying about text messages he sent to his friend. *Supra* ¶¶ 22-34. J.P. testified that he texted his friend "everything that happened." The substance of the texts themselves was never put into evidence, and the friend was not called as a witness. The majority views this reference to the victim's texts as the impermissible admission of a prior consistent statement. The State contends that these are not out-of-court statements because nothing of the substance of what was in the texts was admitted. I believe the State's argument has merit, and an objection could have

22

been properly overruled. But even assuming that the testimony regarding the text messages was improper, as our supreme court has recognized similar circumstances,

> "the prejudicial effect of this testimony was minimized by the fact that, unlike some cases relied upon by defendant where one witness corroborated another's testimony by testifying that the other made a prior consistent statement, here [the victim] himself provided the evidence of his own prior consistent statement, and so his credibility was not truly enhanced." *People v. Henderson*, 142 Ill. 2d 258, 311 (1990).

Indeed, even in *Henderson*, which the majority relies on here, the supreme court refused to find that a failure to object to the admission of a "prior consistent" statement would support a claim for ineffective assistance of counsel in a jury trial. *Id.* at 311-12.

¶ 60     In asking us to reverse this conviction on the basis of ineffective assistance of counsel, Mr. Smart has the burden of demonstrating that, had trial counsel objected to some or all of this evidence, there is a reasonable probability that the trial judge, as the finder of fact, would have acquitted him. To make this showing, Mr. Smart must overcome the strong presumption that, in a bench trial, the court considers only admissible evidence. I simply do not agree that this showing has been made or that the majority's decision is in accordance with the mandate of our supreme court.

***People v. Smart*, 2025 IL App (1st) 220427-B**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CR-14458; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Kathleen M. Flynn, and Kara Kurland, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Mary L. Boland, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |